UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| RICHARD F. RUSSELL,<br><br>    Plaintiff,<br><br>v.<br><br>MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFF'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Case No. 4:24-cv-00098-AMA-PK<br><br>District Judge Ann Marie McIff Allen<br><br>Magistrate Judge Paul Kohler |

This matter comes before the Court on a Motion for Judgment on the Pleadings filed by Defendant Massachusetts Mutual Life Insurance Company ("MassMutual")[1] and a Cross-Motion for Judgment on the Pleadings filed by Plaintiff Richard F. Russell ("Dr. Russell").[2] For the reasons discussed below, the Court grants Defendant's Motion and denies Plaintiff's Cross-Motion.

### **BACKGROUND**[3]

In 1988, Dr. Richard Russell purchased from Connecticut Mutual Life Insurance

---

[1] ECF No. 32, filed August 8, 2025.
[2] ECF No. 36, filed September 9, 2025.
[3] The facts below are taken from Plaintiff's Complaint and the documents attached thereto. ECF No. 1. For the purposes of the Motion and Cross-Motion at issue, the Court will treat the facts alleged in the Complaint as true.

1

Company[4] a Disability Income Policy, No. 4794017 ("Policy #1")[5] that became effective on October 11, 1988.[6] In addition to the Basic Policy, Dr. Russell purchased a Cost of Living Adjustment Rider ("COLA Rider")[7] and a Lifetime Total Disability Benefits Rider ("Lifetime Rider").[8] The Basic Policy provided a basic monthly benefit in the amount of $10,000 per month.[9] The COLA Rider provided monthly benefit increases to align with cost-of-living increases—these increases were calculated annually based on (1) the applicable basic monthly benefit amount and (2) the applicable COLA percentage.[10]

In 1990, Dr. Russell purchased an additional Disability Income Policy, No. 4908915 ("Policy #2")[11] that became effective on January 15, 1990.[12] Dr. Russell also purchased once more a COLA Rider and a Lifetime Rider.[13] The Basic Policy provided a basic monthly benefit of $2,500,[14] and the COLA Rider provided monthly benefit increases.[15]

In 1996, Dr. Russell became totally disabled.[16] MassMutual began paying Dr. Russell $12,500 pursuant to Policy #1 and Policy #2 (collectively, "the Policies").[17] After one year, MassMutual began paying Dr. Russell an additional sum as provided under the COLA Riders.[18]

---

[4] MassMutual is the successor in interest to Connecticut Mutual Life Insurance Company. *See* ECF No. 1 ¶ 18; ECF No. 32 at 2 n.1.
[5] ECF No. 1 ¶ 6; *id.*, Ex. A.
[6] *Id.* ¶ 7.
[7] *Id.* ¶ 8; *id.* Ex. A at 18.
[8] *Id.* ¶ 9; *id.* Ex. A at 20.
[9] *Id.* ¶ 10; *id.* Ex. A at 15.
[10] *Id.* Ex. A at 18.
[11] *Id.* ¶ 12, *id.* Ex. B.
[12] *Id.* ¶ 13.
[13] *Id.* ¶ 14; *id.* Ex. B at 32–33.
[14] *Id.* ¶ 16; *id.* Ex. B at 28.
[15] *Id.* Ex. B at 33.
[16] *Id.* ¶ 26.
[17] *Id.* ¶ 29.
[18] *Id.* ¶ 30.

By September of 2022, Dr. Russell was receiving $44,450 per month.[19]

Dr. Russell turned 65 years old on August 1, 2022.[20] On October 11, 2022, the anniversary of Policy #1, MassMutual stopped paying Dr. Russell monthly benefits under Basic Policy #1 as modified by the COLA Rider.[21] On January 15, 2023, the anniversary of Policy #2, MassMutual stopped paying Dr. Russell monthly benefits under Basic Policy #2 as modified by the COLA Rider.[22] Following the Policies' anniversaries, respectively, MassMutual began paying Dr. Russell monthly benefits under the Lifetime Riders, for a total of $12,500 per month.[23]

Dr. Russell contends that he is entitled to the COLA Riders' benefits for the rest of his life. He initiated this action on December 5, 2024.[24] On August 8, 2025, MassMutual moved for judgment on the pleadings.[25] On September 5, 2025, Dr. Russell filed his response to MassMutual's Motion,[26] to which MassMutual replied on September 26, 2025.[27] Dr. Russell filed his Cross-Motion for Judgment on the Pleadings on September 9, 2025, seeking a total judgment amount of $1,347,023.64.[28] MassMutual filed its response on October 7, 2025,[29] and Dr. Russell filed his reply on October 28, 2025.[30]

---

[19] *Id.* ¶ 31.
[20] *Id.* ¶ 40.
[21] *Id.* ¶¶ 41, 44–45.
[22] *Id.*
[23] *Id.*
[24] ECF No. 1.
[25] ECF No. 32.
[26] ECF No. 35.
[27] ECF No. 39.
[28] ECF No. 36.
[29] ECF No. 40.
[30] ECF No. 43.

## **LANGUAGE OF THE POLICIES**[31]

The Basic Policies provide for total disability benefits,[32] which are defined as follows: "[y]ou're totally disabled if because of sickness or injury you can't do the main duties of your occupation. You must be under a doctor's care."[33] Total disability benefits, generally, will only be paid "up to the maximum benefit period."[34] The Maximum Benefit Period is defined as "[t]he maximum length of time we'll pay benefits, whether for total disability, residual disability or a combination of both."[35] The Basic Policies each describe that "[t]his policy ends on the Anniversary on or following your 65th birthday."[36]

The COLA Riders provide "monthly benefit increases while you're totally or residually disabled."[37] The COLA Riders state in relevant part as follows:

> **When We'll Pay Monthly Benefit Increases.**[38] We'll pay monthly benefit increases while you're receiving total or residual disability benefits.
> . . .
> **How Long We'll Pay Benefit Increases.** While you're totally or residually disabled,

---

[31] Other than the specific dates and numerical values unique to each Policy, the Policies' language is identical.

[32] The Basic Policies provide that "[e]ach monthly payment made during the first 12 months of total disability will equal your basic monthly benefit shown on the Coverage Page." ECF No. 1, Ex. A at 14; *id*. Ex. B at 27. After the first year, the "benefit will be based on your loss of income[,]" and the "monthly benefit payment . . . will equal your basic monthly benefit multiplied by the ratio of your loss of income to your predisability income." *Id*. But "[i]f you have no current income or if your current income is less than 25% of your predisability income, your monthly benefit payment will equal your basic monthly benefit." *Id*.

[33] ECF No. 1, Ex. A at 14; *id*. Ex. B at 27.

[34] *Id*.

[35] *Id*.

[36] *Id*. Ex. A at 17; *id*. Ex. B at 30.

[37] *Id*. Ex. A at 18; id. Ex. B at 33.

[38] These monthly benefit increases are "computed by using: the basic monthly benefit under your policy and, if any; the monthly benefit under a Social Security Substitute Rider or Extended Term Rider; your loss of income." *Id*. "For the first 12 months that you're entitled to monthly benefit increases under this rider, we'll multiply your monthly benefit . . . by the percentage shown on your current Coverage Page." *Id*. "After you've received 12 monthly benefit increases under this rider, we'll adjust your monthly benefit . . . by a new percentage to compute each 12 monthly benefit increases thereafter." *Id*.

4

we'll pay benefit increases until the earliest of:
• the date your total or residual disability ends;
• the date the maximum benefit period under this rider ends; [or]
• the anniversary on or after your 65th birthday.
. . .
**Termination.** This rider will end on the earliest of the following dates:
• 31 days after the due date of any unpaid premium;
• as of the next premium due date upon your written request;
• the anniversary on or after your 65th birthday; [or]
• the date that your policy ends.[39]

The Lifetime Riders "provide[] monthly total disability benefits to be paid beyond the Anniversary on or after your 65th birthday. Benefits will be paid for life."[40] The Lifetime Riders also include the following relevant terms:

**Definition of Total Disability.** You're totally disabled under this rider if because of sickness or injury:
• you can't do the main duties of your occupation[;]
AND
• you're not working at any other job or business.
You must also be under a doctor's care.
**Eligibility.** To qualify for monthly total disability benefits under this rider you must meet these three conditions:
• you must be totally disabled[;]
• you must have become totally disabled before the Anniversary on or after your 65th birthday and remained totally disabled since. A recurring disability will not affect your eligibility[;]
• the Anniversary on or after your 65th birthday must have occurred.
**When We'll Pay Monthly Total Disability Benefits.** If you're eligible, your monthly benefits under this rider will start after the Anniversary on or after your 65th birthday. We'll make the first payment 1 month after that Anniversary. We'll continue to make monthly payments as long as you remain totally disabled.
**Monthly Total Disability Benefit.** The largest amount of monthly benefit you will receive under this rider is shown on the current Coverage Page of your policy. You will receive this amount if you become totally disabled before the Anniversary on or after

---

[39] *Id.*
[40] *Id.* Ex. A at 20; *id.* Ex. B at 32.

your 55th birthday[41] . . . In any case, we'll base your benefits on your loss of income (your predisability income minus your current income). We'll multiply your monthly benefit by the ratio of your loss of income to your predisability income.

. . .

**Termination.** This rider will end on the earliest of the following dates.
- 31 days after the due date of any unpaid premium[;]
- as of the next premium due date upon your written request[;]
- the Anniversary on or after your 65th birthday[; or]
- the date that your policy ends.[42]

The Policies' Coverage Pages are reflected in pertinent part below.[43]

| EFFECTIVE DATE | COVERAGE | MONTHLY BENEFIT | WAITING PERIOD | MAXIMUM* BENEFIT PERIOD | ANNUAL PREMIUM | PAYABLE TO YEAR |
|---|---|---|---|---|---|---|
| OCT 11 1988 | BASIC MONTHLY BENEFIT | $10,000 | 30 DAYS | TO 65 | $3,022.00 | 2021 |
|  | ADDITIONAL BENEFITS - SEE ATTACHED RIDERS FOR DETAILS- |  |  |  |  |  |
| OCT 11 1988 | PARTIAL DISABILITY | $5,000 | 30 DAYS |  | $432.00 | 2021 |
| OCT 11 1988 | OPTIONS TO BUY ADDITIONAL BENEFITS TOTAL ADDITIONAL BENEFITS | $5,000 |  |  | $124.50 | 2011 |
| OCT 11 1988 | LIFETIME ACCIDENT/SICKNESS | $10,000 |  |  | $504.00 | 2021 |
| OCT 11 1988 | COST OF LIVING RIDER MAXIMUM 5.00 % |  |  |  | $720.00 | 2021 |
| OCT 11 1988 | OWN OCCUPATION/ PRESUMPTIVE DIS RIDER | $10,000 |  |  | $335.00 | 2021 |

YOUR MAXIMUM MONTHLY BENEFIT IS $10,000    TOTAL ANNUAL PREMIUM $5,137.50

| EFFECTIVE DATE | COVERAGE | MONTHLY BENEFIT | WAITING PERIOD | MAXIMUM* BENEFIT PERIOD | ANNUAL PREMIUM | PAYABLE TO YEAR |
|---|---|---|---|---|---|---|
| JAN 15 1990 | BASIC MONTHLY BENEFIT | $2,500 | 30 DAYS | TO 65 | $810.25 | 2022 |
|  | ADDITIONAL BENEFITS - SEE ATTACHED RIDERS FOR DETAILS- |  |  |  |  |  |
| JAN 15 1990 | PARTIAL DISABILITY | $1,250 | 30 DAYS |  | $110.25 | 2022 |
| JAN 15 1990 | LIFETIME ACCIDENT/SICKNESS | $2,500 |  |  | $132.75 | 2022 |
| JAN 15 1990 | COST OF LIVING RIDER MAXIMUM 5.00 % |  |  |  | $186.75 | 2022 |
| JAN 15 1990 | OWN OCCUPATION/ PRESUMPTIVE DIS RIDER | $2,500 |  |  | $88.75 | 2022 |

YOUR MAXIMUM MONTHLY BENEFIT IS  $2,500    TOTAL ANNUAL PREMIUM $1,328.75

---

[41] There is no dispute that Dr. Russell became totally disabled before the Anniversary on or after his 55th birthday.
[42] ECF No. 1, Ex. A at 20; *id*. Ex. B at 32.
[43] *Id*. Ex. A at 15; *id*. Ex. B at 28.

The asterisk next to "MAXIMUM BENEFIT PERIOD" corresponds with the following language: "Your benefit period may extend beyond OCT 11 2022 [for Policy #1 and JAN 15 2023 for Policy #2] if you qualify for benefits under the lifetime accident/sickness rider. See your rider for details."[44]

## LEGAL STANDARD

Courts apply the same standard in reviewing a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) as they do in reviewing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[45] Accordingly, to survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[46] As with a Rule 12(b)(6) motion, in construing a plaintiff's complaint, the Court will assume the truth of any well-pleaded facts and draw all reasonable inferences in the light most favorable to the plaintiff.[47] "Documents attached to the pleadings . . . are subject to full consideration in a court's review of a Rule 12(c) motion."[48]

## DISCUSSION

**A.     Breach of Contract**

Under Utah law,[49] "[t]he elements of a prima facie case for breach of contract are (1) a

---

[44] *Id.*
[45] *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1302–03 (10th Cir. 2021).
[46] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[47] *See Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011).
[48] *United States v. Zazi*, 356 F. Supp. 3d 1105, 1114 (D. Colo. 2018).
[49] "When, as here, a federal court is exercising diversity jurisdiction, it must apply the substantive law of the forum state." *Dyno Nobel v. Steadfast Ins. Co.*, 85 F.4th 1018, 1025 (10th Cir. 2023) (citation modified). Here, the parties do not dispute the applicability of Utah law, and thus the Court will apply Utah law.

contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[50] Dr. Russell asserts that MassMutual breached the terms of the Policies by, following the Policies' respective anniversaries after Dr. Russell's 65th birthday, paying him only $12,500 per month. MassMutual contends that Dr. Russell is only entitled to $12,500 per month under the Policies' terms.

"Insurance policies are contracts between the insurer and the insured and must be analyzed according to principles of contract interpretation."[51] Courts first "look to the contract and construe its terms to give effect to the intentions of the parties."[52] Insurance contracts are construed "by considering their meaning to a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy."[53] "[I]t is axiomatic that a contract should be interpreted so as to harmonize all of its provisions and all of its terms, which terms should be given effect if it is possible to do so."[54]

"[I]f the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language[,]"[55] and "the contract may be interpreted as a matter of law."[56] "If, on the other hand, [courts] determine there is an ambiguity in the insurance policy," courts "resolve any ambiguity or uncertainty in the language of an insurance policy . . . in favor of coverage."[57] "An ambiguity exists when a

---

[50] *Am. West Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224.
[51] *Compton v. Hou. Cas. Co.*, 2017 UT 17, ¶ 17, 393 P.3d 305.
[52] *Id*.
[53] *Id*. (citation modified).
[54] *LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988).
[55] *Compton*, 2017 UT 17 at ¶ 17.
[56] *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134.
[57] *Compton*, 2017 UT 17 at ¶ 18 (citation modified).

provision is capable of more than one *reasonable* interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[58] "[T]erms are not ambiguous 'simply because one party seeks to endow them with a different interpretation according to his or her interests.'"[59]

      As a threshold matter, Dr. Russell contends that the Court must consider extrinsic evidence in determining whether a facial ambiguity exists within the Policies.[60] In *Ward*, the Utah Supreme Court "set forth a two-part standard for determining facial ambiguity"—first, "[w]hen determining whether a contract is ambiguous, any relevant evidence must be considered[,]" and second, "after a judge considers relevant and credible evidence of contract interpretations, the judge must ensure that 'the interpretations contended for are reasonably supported by the language of the contract.'"[61] However, as Judge Parrish noted, "*Ward* and *Daines* appear to be aberrations that do not accurately describe current Utah law on determining whether a contract is facially ambiguous."[62]

      While "the Utah Supreme Court has never expressly overruled *Ward* or *Daines* and has even cited both cases recently for other propositions," "*Ward* and *Daines* are irreconcilable with the Utah Supreme Court's more recent pronouncements on the subject."[63] For example, in 2009, the Utah Supreme Court stated that "[u]nder basic rules of contract interpretation, courts first look to the writing alone to determine its meaning and the intent of the contracting parties."[64]

---

[58] *Id*. (emphasis in original) (citation modified).
[59] *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (quoting *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428).
[60] *See, generally, Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264 (Utah 1995); *Daines v. Vincent*, 2008 UT 51, 190 P.3d 1269 (discussing *Ward*, 907 P.2d 264).
[61] *Daines*, 2008 UT 51 at ¶ 26 (quoting *Ward*, 907 P.2d at 268).
[62] *Lifevantage Corp. v. Domingo*, 208 F. Supp. 3d 1202, 1215 (D. Utah 2016).
[63] *Id*.
[64] *Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 44, 201 P.3d 966.

"Only where there is ambiguity in the terms of the contract may the parties' intent 'be ascertained from extrinsic evidence.'"[65] In 2016, the Utah Supreme Court stated that "[i]f the parties' intentions cannot be determined from the face of the contract, 'extrinsic evidence must be looked to in order to determine the intentions of the parties[,]'"[66] and proceeded to look to the contract's language and find that language facially unambiguous without considering extrinsic evidence.[67] The Utah Supreme Court then considered *Ward's* proposition that "any relevant evidence *must* be considered"[68] in the context of a latent ambiguity[69] and even there declined to consider the defendant's proffered extrinsic evidence,[70] noting that "instances where extrinsic evidence is allowed to 'uncover' a latent ambiguity 'will prove to be the exception and not the rule.'"[71]

Thus, overall, "[t]he Utah Supreme Court's more recent cases demonstrate that it has, at least *sub-silentio*, rejected the *Ward* test as applied to questions of facial ambiguity."[72] "Accordingly, under Utah law, the [C]ourt must first interpret the [Policies] using 'the writing alone to determine [their] meaning.'"[73]

---

[65] *Id*. (quoting *Deep Creek Ranch, LLC v. Utah State Armory Bd.*, 2008 UT 3, ¶ 16, 179 P.3d 886).

[66] *Mind & Motion*, 2016 UT 6 at ¶ 24 (quoting *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 19, 54 P.3d 1139).

[67] *Id*. ¶¶ 25–37.

[68] *Id*. ¶ 38 (emphasis in original) (quoting *Ward*, 907 P.2d at 268).

[69] "A latent ambiguity is one that cannot be found within the four corners of the document but is only discoverable through the introduction of extrinsic evidence." *Id*. ¶ 40.

[70] *Id*. ¶ 44.

[71] *Id*. ¶ 40 (quoting *Daines*, 2008 UT 51 at ¶ 30 n.5).

[72] *Lifevantage Corp.*, 208 F. Supp. 3d at 1215. While it is true that the Utah Court of Appeals recently cited *Daines*, this does not change that *Daines* and the *Ward* test are not in line with the Utah Supreme Court's more recent pronouncements. *See Schmith v. Schmit*, 2025 UT App 124, ¶ 19, 577 P.3d 365.

[73] *Lifevantage Corp.*, 208 F. Supp. 3d at 1216 (quoting *Giusti*, 2009 UT 2 at ¶ 44). Even were the Court to apply the *Ward* test, the outcome of this decision would not change. "[A] correct application of the *Ward* rule to determine what the writing means begins and ends with the

Dr. Russell asserts that the language stating the Lifetime Riders "provide[] monthly total disability benefits to be paid beyond the Anniversary on or after your 65th birthday" incorporates all components of disability benefits payable to Dr. Russell, meaning that the Lifetime Riders extend both the Basic monthly benefits and the COLA benefit increases. This interpretation, however, is not reasonable when looking at how the individual components of the Policies work together as a whole.

The Basic Policies provide a "basic monthly benefit" reflected on the Coverage Pages.[74] The Basic Policies end "on the Anniversary on or following your 65th birthday."[75] The COLA Riders provide, under the bolded heading "**How Long We'll Pay Benefit Increases**[,]" that COLA increases will be paid "until the earliest of: . . . the anniversary on or after your 65th birthday."[76] The COLA Riders also provide that "[t]his rider will end on the earliest of the following dates: . . . the anniversary on or after your 65th birthday."[77] Based on this plain and unambiguous language, it is clear that Dr. Russell's Basic Policy benefits and COLA benefit increases ended on the anniversary on or after his 65th birthday.

Nonetheless, total disability benefits will be provided "up to the maximum benefit period."[78] The Coverage Pages reflect that the "Maximum Benefit Period" is "65" but also provide that the benefit period may be extended beyond the date of the Policy's anniversary

---

language of the contract." *Daines*, 2008 UT 51 at ¶ 30. A finding of ambiguity is justified "only if the competing interpretations are reasonably supported by the language of the contract[,]" and "there can be no ambiguity where evidence is offered in an attempt to obscure otherwise plain contractual terms." *Id.* (citation modified). Here, even reviewing Dr. Russell's proffered extrinsic evidence, the language of the Policies is facially unambiguous.

[74] ECF No. 1, Ex. A at 15; *id.* Ex. B at 28.
[75] *Id.* Ex. A at 17; *id.* Ex. B at 30.
[76] *Id.* Ex. A at 18; *id.* Ex. B at 33.
[77] *Id.*
[78] *Id.* Ex. A at 14; *id.* Ex. B at 27.

following the 65th birthday if an individual qualifies for benefits under the Lifetime Accident/Sickness Rider.[79] The Coverage Pages then instruct the reader to see that Rider for details.[80] The Lifetime Riders in turn "contain[] [their] own benefits provision,"[81] which, if an individual is eligible, will begin one month "after the Anniversary on or after your 65th birthday Anniversary" and will award "monthly total disability benefits [that will] be paid beyond the Anniversary on or after your 65th birthday . . . for life."[82] These benefits are "base[d] . . . on your loss of income" in that the monthly benefit will be "multipl[ied] . . . by the ratio of your loss of income to your predisability income."[83] The Lifetime Riders further provide that "[t]he largest amount of monthly benefit you will receive under this rider is shown on the current Coverage Page of your policy[,]" and that an individual will receive that amount if, like Dr. Russell, the individual became "totally disabled before the Anniversary on or after [the individual's] 55th birthday."[84] The Coverage Page then clearly indicates a monthly benefit of $10,000 for Policy #1 and $2,500 for Policy #2 beside the Lifetime Accident/Sickness Rider and also states that "your maximum monthly benefit is $10,000" (for Policy #1) and "$2,500" (for Policy #2).[85] In other

---

[79] *Id*. Ex. A at 15; *id*. Ex. B at 28.
[80] *Id*.
[81] *Wickboldt v. Mass. Mut. Life Ins. Co.*, 836 F. App'x 788, 792 (11th Cir. 2020) (unpublished). While this decision does not bind this Court, the Court finds it persuasive. The *Wickboldt* court considered seemingly identical policy language and arguments. Dr. Russell, in arguing against the persuasive value of this case, seems to suggest that the Eleventh Circuit panel did not put sufficient consideration and analysis into the decision. That a decision is straightforward does not mean that the circuit judges did not sufficiently consider the issues.
[82] ECF No. 1, Ex. A at 20; *id*. Ex. B at 32.
[83] *Id*.
[84] *Id*.
[85] *Id*. Ex. A at 15; *id*. Ex. B at 28. Dr. Russell contends that the "maximum monthly benefit" cannot possibly be the maximum because the COLA Riders supplemented the Basic Policies' benefits such that he was receiving a monthly payment greater than $12,500. This argument conflates the terms "monthly benefit" and "monthly payment." The Basic Policies provide that "[e]ach monthly payment made during the first 12 months of total disability will equal your basic monthly benefit shown on the Coverage Page." *Id*. Ex. A at 14; *id*. Ex. B at 27. In other words,

12

words, the Lifetime Riders create their own set of benefits[86]—"wholly unrelated to benefits paid out under the Basic Polic[ies] and based on [their own] means of calculating those benefits—that are not due to be paid until one month after the Anniversary on or after Dr. [Russell's] 65th birthday."[87] "By the time Lifetime Rider benefits begin, benefits under both the Basic Policy and the COLA Rider benefits have ended."[88] And under the Lifetime Riders, Dr. Russell is only

---

for the first year, an individual with the same coverage as Dr. Russell would receive a monthly payment equaling $12,500. After the first year, the "benefit will be based on your loss of income" and "the monthly benefit payment . . . will equal your basic monthly benefit multiplied by the ratio of your loss of income to your predisability income." *Id*. But "[i]f you have no current income or if your current income is less than 25% of your predisability income, your monthly benefit payment will equal your basic monthly benefit." *Id*. Monthly *payment* and monthly *benefit* are, thus, not synonymous—the monthly payment is not necessarily identical to the basic monthly benefit listed on the Coverage Page but may be a reduced number. The COLA Riders' increases are then calculated by multiplying the basic monthly benefit by a certain percentage, and an individual would receive an additional sum based on that calculation. *Id*. Ex. A at 18; *id*. Ex. B at 33. Therefore, the "maximum monthly benefit" does not necessarily mean that an individual would not receive a monthly *payment* greater than the "maximum monthly benefit" amount when the Basic Policies and COLA Riders are in force, as the COLA Riders are providing an increase. Rather, it means that the monthly benefit used in the COLA Riders' increase calculation will not exceed that specified number. However, the COLA Riders have terminated by the time the Lifetime Riders come into effect, and while it appears possible that the benefit amount under the Lifetime Riders may be increased by a Social Security Substitute Rider, the Social Security Substitute Rider is not at issue here. *See id*. Ex. A at 20; *id*. Ex. B at 32. Thus, monthly payments under the Lifetime Riders would not exceed that maximum monthly benefit number.

[86] Also supporting that the Lifetime Riders' benefits are not simply an extension of the Basic Policies' benefits is the fact that the Lifetime Riders' contain a different definition of total disability than the Basic Policies. The Lifetime Riders provide that "[y]ou're totally disabled under this rider if because of sickness or injury: you can't do the main duties of your occupation[,] AND you're not working at any other job or business. You must also be under a doctor's care." *Id*. Ex. A at 20; *id*. Ex. B at 32. The Basic Policies, on the other hand, provide that "[y]ou're totally disabled if because of sickness or injury you can't do the main duties of your occupation. You must be under a doctor's care." *Id*. Ex. A at 14; *id*. Ex. B at 27. Thus, an individual could receive total disability benefits under the Basic Policies while working at a job other than their occupation. But an individual could not receive total disability benefits under the Lifetime Riders in those circumstances.

[87] *Wickboldt*, 836 F. App'x at 792.

[88] *Id*.

13

entitled to $12,500 per month.[89]

Dr. Russell argues that the use of "benefits," plural, in "monthly total disability benefits to be paid beyond the Anniversary on or after your 65th birthday"[90] must mean that the Basic Policy benefits and COLA Rider benefits are extended—or must at the very least create an ambiguity suggesting such. But language is only ambiguous if it can be open to more than one reasonable interpretation, and there is nothing suggesting that Dr. Russell's interpretation is reasonable. Nowhere do the Lifetime Riders mention the Basic Policies' benefits or the COLA Riders' benefit increases, and to read "benefits" as including these benefits, the Court would have to ignore clear and unambiguous language that these benefits end before the Lifetime Riders take effect. Indeed, the use of "benefits" can be explained by looking under the Lifetime Riders' "**Monthly Total Disability Benefit**" heading. There, the Riders refer to the "largest amount of monthly benefit" and provide that "benefits" will be based on loss of income in that the "monthly benefit" will be multiplied by the ratio of loss of income to predisability income.[91] In other words, the singular benefit refers to the specific monetary amount used to calculate the general benefits received under the Lifetime Riders.

Dr. Russell further argues that it is absurd for MassMutual to argue that the COLA Riders, pursuant to their termination provision, terminate when the Lifetime Riders do not because the Lifetime Riders also contain a termination provision. The Court disagrees. The purpose of the Lifetime Riders is to provide benefits "beyond the Anniversary on or after your 65th birthday."[92] The COLA Riders contain no such purpose; in fact, they clearly state that

---

[89] ECF No. 1, Ex. A at 15; *id*. Ex. B at 28.
[90] *Id*. Ex. A at 20; *id*. Ex. B at 32.
[91] *Id*.
[92] *Id*.

benefit increases will only be paid "until the earliest of . . . the anniversary on or after your 65th birthday."[93] While it is true that the Lifetime Riders do contain a termination provision stating that "[t]his rider will end on the earliest of the following dates . . . the Anniversary on or after your 65th birthday[,]"[94] the Court agrees with the Eleventh Circuit that this termination provision is not "in conflict with the provision describing when benefits begin."[95] Benefits under the Lifetime Riders are conditional—an individual only receives the benefits if the individual is qualified. To qualify, an individual must be totally disabled under the Riders' definition, "must have become totally disabled before the Anniversary on or after [the] 65th birthday and remained totally disabled since[,]" and "the Anniversary on or after [the] 65th birthday must have occurred."[96] "There will not be a benefit under this rider if total disability begins after the Anniversary on or after [the] 65th birthday."[97] If an individual is not qualified, the Lifetime Riders, pursuant to the termination provisions, terminate along with the COLA Riders and the Basic Policies "on the earliest of . . . the Anniversary on or after your 65th Birthday."[98]

      Dr. Russell also urges the Court to follow *Colt v. Massachusetts Mutual Life Insurance Company*, No. 2010-03511, 2012 WL 1739145 (Mass. Super. Ct. May 1, 2012). In *Colt*, the Massachusetts state trial court analyzed a policy seemingly identical to the Policies at issue. But the lens through which the *Colt* court analyzed the policy was narrowed by concessions MassMutual made in that case. For example, there, MassMutual argued that the Lifetime Rider extended the monthly benefit under the Basic Policy but not the COLA Rider increases, and the

---

[93] *Id*. Ex. A at 18; *id*. Ex. B at 33.
[94] *Id*. Ex. A at 20; *id*. Ex. B at 32.
[95] *Wickboldt*, 836 F. App'x at 791 n.3.
[96] ECF No. 1, Ex. A at 20; *id*. Ex. B at 32.
[97] *Id*.
[98] *Id*.

court could "find no basis in the language of the policy as a whole to justify the insurer's distinction between the types of benefits."[99]

The Court declines to follow *Colt*. The concessions made in *Colt* are not at play here. And the Court agrees with the Eleventh Circuit that the Coverage Pages are not "inconsistent with the termination provisions in the Basic Polic[ies] and the COLA Rider[s]."[100] "Rather, the Coverage Page[s] explain[] exactly how much Dr. [Russell] is entitled to under the Basic Polic[ies] and each Rider."[101] Furthermore, the Appeals Court of Massachusetts recently described a similar policy as follows:

> Here, from age sixty-two to age sixty-five, Landvater was paid the Monthly Benefit of $10,125 under the total disability policy. That benefit *terminated* on September 14, 2021. Without the Lifetime Rider, Landvater would not have been entitled to any further payments. However, because she purchased the *separate benefit of the Lifetime Rider*, Landvater was entitled to receive payments after the total disability policy expired. Therefore, in September of 2021, the policy anniversary after Landvater reached the age of sixty-five, she *stopped* receiving her Monthly Benefit and *began* receiving her lifetime monthly payments under the Lifetime Rider. Since Landvater's disability occurred during the seventh policy year following the policy anniversary after her fifty-fifth birthday, her full monthly payment under the Lifetime Rider was reduced by seventy percent, which reflects a ten percent reduction for each year her disability began after the policy anniversary.[102]

While *Landvater* is unpublished and the court was faced with a different legal question, the Court finds that *Landvater* casts some shadow over the persuasive value of *Colt* and its holding that the Lifetime Rider extends the Basic Policy benefits and COLA benefit increases.

The Court acknowledges that the Policies are complicated with their many moving

---

[99] *Colt*, 2012 WL 1739145, at *5.
[100] *Wickboldt*, 836 F. App'x at 792.
[101] *Id*.
[102] *Landvater v. Mass. Mut. Life Ins. Co.*, No. 24-P-232, 2025 WL 274070, at *3 (Mass. App. Ct. Jan. 23, 2025) (emphasis added).

16

pieces. But complicated is not equivalent to ambiguous, and there is nothing in the plain, unambiguous language of the Policies to support Dr. Russell's argument that the Lifetime Riders extend benefits under the Basic Policies and COLA Riders. Rather, it is clear that Dr. Russell is only entitled to benefits under the Lifetime Riders, which amount to the $12,500 per month he is currently being paid. MassMutual is entitled to judgment on the pleadings on this claim, and the Court will dismiss this claim with prejudice.[103]

**B. Breach of the Implied Covenant of Good Faith and Fair Dealing**

In Utah, "a covenant of good faith and fair dealing inheres in most, if not all, contractual relationships."[104] "Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract."[105] "[E]xpress breach of contract and breach of the implied covenant of good faith and fair dealing are separate causes of action" under Utah law.[106] "When a claim for breach of contract is pleaded separately from a claim for breach of the implied covenant . . . one plausible way to interpret the pleading is to construe the breach of contract claim as seeking relief for breaches of express terms of the contract, and to construe the claim for breach of the implied covenant as seeking relief only for breaches of that particular implied provision."[107]

The Utah Supreme Court has held that "when an insured's claim is fairly debatable, the

---

[103] *See Pena v. Greffet*, 110 F. Supp.3d 1103, 1112 (D.N.M. 2015) ("Claims dismissed pursuant to a motion under rule 12(c) are dismissed with prejudice."); *Young v. Young*, No. 2:17-cv-00082, 2018 WL 4643003, at *3 (D. Utah Sept. 27, 2018) (dismissing claims with prejudice when judgment on the pleadings in favor of the defendants was appropriate).
[104] *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991).
[105] *Id.* at 199–200.
[106] *Terry v. Hinds*, 47 F. Supp. 3d 1265, 1274 (D. Utah 2014).
[107] *Olé Mexican Foods Inc. v. J & W Distrib. LLC*, 2024 UT App 67, ¶ 36, 549 P.3d 663.

insurer is entitled to debate it and cannot be held to have breached the implied covenant of good faith if it chooses to do so."[108] "Therefore, an insurer cannot be held to have breached the covenant of good faith on the ground that it wrongfully denied coverage if the insured's claim, although later found to be proper, was fairly debatable at the time it was denied."[109]

Here, Dr. Russell alleges that MassMutual breached the implied covenant of good faith and fair dealing by failing to pay the full amounts owed under the terms of the Policies, which is the same basis for Dr. Russell's breach of contract claim. Dr. Russell's claim for breach of the implied covenant of good faith and fair dealing is thus redundant of and subsumed by his breach of contract claim upon which MassMutual is entitled to judgment as a matter of law.[110]

Nonetheless, Dr. Russell asserts that the Court should dismiss this claim without prejudice with an opportunity to file a motion for leave to amend. Such a cursory assertion is insufficient to convince the Court to exercise its discretion in this manner—"a district court may deny leave to amend when a plaintiff fails to file a written motion and instead merely suggests [he] should be allowed to amend if the court conclude[s] h[is] pleadings [a]re infirm."[111] The Court is also not convinced that any such amendment would not be futile. To the extent Dr. Russell attempts to allege that MassMutual acted in bad faith in refusing to pay Dr. Russell's requested amounts, MassMutual's refusal and its benefits calculation were based on a fairly debatable—and indeed correct—interpretation of the Policies' language. Thus, MassMutual is

---

[108] *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 7, 286 P.3d 301 (citation modified).
[109] *Id.* (citation modified).
[110] *See Canopy Corp. v. Symantec Corp.*, 395 F. Supp. 2d 1103, 1111 (D. Utah 2005) ("[Plaintiff's] claim for breach of the covenant of good faith and fair dealing is redundant of its breach of contract claim."); *A.I. Transp., Div. of Ins. Co. of State of Pa. v. Imperial Premium Fin., Inc.*, 862 F. Supp. 345, 349 (D. Utah 1994) ("[D]efendants' action for breach of the implied covenant of good faith and fair dealing is subsumed by their breach of contract action.").
[111] *Johnson v. Spencer*, 950 F.3d 680, 721 (10th Cir. 2020) (citation modified).

entitled to judgment on the pleadings on this claim, and the Court will dismiss this claim with prejudice.

## **ORDER**

For the reasons discussed above, the Court orders as follows:

1. Defendant's Motion for Judgment on the Pleadings (ECF No. 32) is GRANTED. Plaintiff's claims are DISMISSED WITH PREJUDICE.

2. Plaintiff's Cross-Motion for Judgment on the Pleadings (ECF No. 36) is DENIED.

DATED this 20th day of February 2026.   BY THE COURT:

_____
Ann Marie McIff Allen
United States District Judge